# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

DAVID L. HUNT,           )
                                      )
        Plaintiff,         )
                                      )
       vs.                  )          Case No. 2:13CV42 CDP
                                      )
CAROLYN W. COLVIN,      )
Commissioner of Social Security,   )
                                      )
        Defendant.      )

## MEMORANDUM AND OPINION

This is an action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for judicial review of the Commissioner's final decision denying David L. Hunt's application for supplemental security income (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381 *et seq*. Hunt claims he is disabled because he suffers from a combination of impairments, including back and neck pain, carpal tunnel, depression and knee pains. After a hearing, the Administrative Law Judge concluded that given Hunt's age, education, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy. Because I find that the ALJ applied the wrong legal standard in evaluating the opinion of Hunt's nurse practitioner I will reverse and remand for further proceedings.

# I.    **Procedural History**

Hunt filed his application for supplemental security income benefits on November 16, 2009.  He alleged an onset date of August 26, 1994.  When his application was denied, Hunt requested a hearing before an administrative law judge.  He then appeared, via video conference, at an administrative hearing on April 20, 2011, where he was represented by attorney Karen Kraus Bill.  Hunt, a medical expert, and a vocational expert testified at the hearing.

After the hearing, the ALJ denied Hunt's application, and Hunt appealed to the Appeals Council.  On March 28, 2013, the Council denied his request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Hunt now appeals to this court.  He argues that the ALJ erred by: (1) failing to give proper weight to the opinions of Hunt's treating physician, Ian Fawks, D.O. and treating nurse practitioner, Chris Hartigan; and (2) failing to provide a sufficient medical basis for his residual functional capacity (RFC) finding.  Hunt claims these mistakes led to a decision by the ALJ that was not supported by substantial evidence and should be reversed or remanded for further evaluation.

## II.    Evidence before the Administrative Law Judge

### *Prior Disability Decision*

In addition to the disability application currently at issue, Hunt previously filed applications for disability insurance benefits and supplemental security income on November 8, 2006. In a written decision dated April 3, 2009, an ALJ denied these earlier applications, determining that Hunt was not disabled because, although he had severe impairments, jobs that he could perform existed in significant numbers in the national economy.

### *Function Reports*

In support of his application, Hunt's girlfriend, Mindy Wilson, completed a third party function report for Hunt in December 2009. In the report, Wilson indicated that she had known Hunt for nearly 13 years. She wrote that his daily activities include taking their daughter to school, watching her after school, feeding and giving water to their cats, minimal vacuuming, loading the dishwasher, doing his own laundry, and watching television. Wilson reported that Hunt's back pain causes him to constantly roll around during sleep and makes it difficult for him to bathe and use the toilet. She reported that Hunt has problems getting along with other people—that he "gets angry and agitated really easy, has no patience with children or other people" and "has real trouble with authority figures, would rather hit them than talk to them." According to Wilson's report, Hunt has quit several

jobs due to an inability to get along with bosses and "other people," and becomes very angry in the face of stress or change. Wilson described Hunt as "a deeply depressed and highly agitated person." She wrote that he previously had jobs involving physical labor but because of his injury and carpal tunnel, he has been unable do such work.

Hunt also completed a function report in December 2009. He reported that his daily activities consist of taking the baby to school, loading the dishwasher, vacuuming (once a week), and sitting or lying down for the rest of the day. He wrote that he cares for the baby when she gets home from school and fills the cats' water dish when necessary. Otherwise, Hunt wrote that Wilson helps him by putting a "roof over [his] head" cooking, helping him shave, and "everything." Hunt reported that his sleep is affected by his constant back pain and by sleep apnea. He wrote that he cannot stand long enough to cook or prepare a meal other than a sandwich. During the day, he reported that watching television is all he can do. Sometimes he plays on the computer, but he cannot sit very long to do so. He reported that for social activities he visits his family's house 1-2 times every two weeks.

Hunt reported he does not like people or big crowds and is not social "any more." He wrote that he does not follow spoken instructions well because his memory is short, and he has difficulty remembering two or three things at a time.

He reported, adamantly, that he does not get along with authority figures and gets irritated and angry in the face of stress or change.  He has a fear of cops and judges.

He wrote that he uses a cane for 3-4 days at a time whenever he is recovering from his "back going out."  The cane is not prescribed by a doctor.

Finally, in the section for additional remarks, Hunt wrote:

"I mostly don't do jack due to my conditions.  I can't do a lot and it pisses me off.  The doctor told me to baby myself so that's what I do.  I don't go out often because I can't stand [people].  Just filling this shit out again has my blood boiling!  I'm always pissed off and upset to the point of tears.  I can't provide for my family help towards bills play around with my kids.  It's a daily ordeal just waking up to this loser life I lead thanks to me for saving some asshole's life that I hurt myself in the first place.  So this is my hero status.  My depression is very high and will most likely be the death of me or someone else.  I am starting to feel like I'm going to get you back [*illegible*].  People fuck with me usually end up hurt one way or another.  My mentality has been gone since 2 years after my accident.  I went from easy going to I don't care if I kill someone or put a hurt on them that's why I stay home away from people I don't know."

[198-208]

### *Physical Residual Function Capacity Assessment*

A physical residual function capacity report was completed by a single decision maker on March 9, 2010.  The SDM listed a primary diagnosis of degenerative disk disease with a secondary diagnosis of obesity.  The report indicates that Hunt's exertional limitations are: occasional lifting or carrying of 20 pounds, frequent lifting or carrying of 10 pounds, standing and/or walking about

six hours in an eight-hour day, sitting about six hours in an eight-hour day, and

unlimited pushing or pulling. In explaining how the evidence supported her

conclusions about Hunt's exertional limitations, the SDM wrote:

> "The claimant is 39 years old with allegations of back, neck, carpal tunnel,
> depression and knee. There is a prior ALJ denial from 4/2009 and appeals
> deferred decision 7/2009. The ALJ opined the claimant had severe
> impairments of obesity and degenerative disk disease. The allegations of
> GERD, sleep apnea, depression and carpal tunnel did not impose significant
> restriction. This appears consistent in light of the medical evidence received
> to date.
>
> The claimant is noted to weigh 292 pounds currently. He was recently seen
> as a 'new patient' on 11/9/2009. The diagnosis of back pain was provided as
> well as hyperlipidemia. He was provided medication to treat his symptoms.
> The claimant has not returned for medical treatment since that time. The
> ALJ referenced multiple imaging studies which had been performed on the
> claimant's L-spine in 2008. An MRI 1/28/08 revealed mild edema L5-S1;
> degenerative disk disease L5-S1, desiccation from L3-S1, bilateral pars
> defect at L5, broad based disc bulge L3-4 and L4-5. Xr on 4/3/2008
> revealed pars defect at L5 – with otherwise no fracture, bone destruction or
> significant joint space narrowing. Conservative treatment was
> recommended. A CT on 6/18/08 showed L5 bilateral spondylosis with
> grade I spondylolisthesis and mild bilateral foraminal stenosis. Since the
> decision, the claimant has been seen on 1 occasion for new patient treatment
> and medications. There are really no significant findings on initial
> evaluation. The above restrictions are appropriate and consider the
> claimant's pain and discomfort."

The SMD found that Hunt had no postural, manipulative, communicative, or

environmental limitations. In noting his symptoms, she reported that since his

denial of benefits in April 2009 he had only been seen by a healthcare professional

on one occasion at which time he was diagnosed with back pain and

hyperlipidemia. She reported that Hunt had not sought any specialist treatment for

his back pain and that his function report contained limitations that were not supported by any diagnostic findings or treatment history. She reported that Hunt could seek treatment for his indications if he wanted to because he has a medical assistance card. Ultimately, she concluded that Hunt was not disabled.

*Medical Records*

On April 17, 2007, Hunt was seen by Christopher J. Hartigan, APRN-BC, FPN-BC[1] for the first time. Hartigan reported that Hunt had "some fatigue, snoring, apnea and a.m. headaches." He had "[r]are chest pain, which is sharp and sternal" one to two times per month, but no associated symptoms. The pain was exacerbated by breathing and alleviated by sitting and lasted one hour. Hartigan reported that Hunt had low-back pain, radiating to the right leg with some numbness and tingling, as well as carpal tunnel in his "bilateral upper extremities." Hartigan reported that Hunt's depression scores were quite high. The report indicates Hunt was in no acute distress, his back exam showed mild diffuse tenderness and straight leg raising was positive on the right. Hartigan prescribed Zantac for Hunt's chest pain caused by gastroesophageal reflux disease. He prescribed Remeron, presumably for Hunt's depression, and Neurontin, Flexeril, Tramadol, and Meloxicam, presumably for the back pain.

---

[1] Hartigan's signature on clinic notes from 2007 indicates he is a board certified Advanced Practice Registered Nurse (APRN). Beginning in 2008, his signature indicates he is a board certified Family Nurse Practitioner (FNP).

On May 3, 2007, Hunt received a spine lumbosacral radiologic exam due to his complaints of low back pain and numbness in his right leg. The radiologist reported that Hunt had L5 spondylolysis and grade 1 spondylolisthesis, that there had been some shifting of the spine and Hunt might need an MRI if there were no improvement.

Hunt was seen by Hartigan again on May 24, 2007. At this visit, Hartigan noted Hunt's GERD and chest pain had improved. Hunt was still experiencing sleep apnea and his insomnia had not changed. He still had "mild diffuse low back pain." Hartigan started Hunt on Trazodone, increased his Remeron, increased the frequency of his Tramadol and gave him samples of Celebrex, an arthritis medication.

Hartigan saw Hunt again on December 4, 2007 for follow-up. He reported Hunt had stopped taking Remeron as frequently because it made him sleepy. Hunt's reflux was improved with Zantac – 150mg twice a day. His chest pain was largely resolved. His lower back pain had not improved and he still had numbness in his right leg on occasion. He was still snoring and feeling tired during the day. Hunt was still dealing with depression, anxiety and insomnia. At this visit Hartigan restarted Hunt on Remeron, ordered a sleep study, ordered an MRI of his back, refilled his Zantac, ordered a psychiatric consult, and told him to lose weight as able.

On January 28, 2008, Hunt received an MRI of his lumbar spine. The MRI showed posterior annular tears with some posterior disk protrusions at L3-4 and L4-5, but no significant central canal stenosis. It showed bilateral pars defects at L5 with grade 1 anterolisthesis of L5 on S1 with associated degenerative disk disease and disk bulge. It showed mild bilateral neural foraminal narrowing at L4-5 and prominent epidural fat from L4 through the mid sacrum, consistent with epidural lipomatosis. The same day, X-rays of Hunt's eyes were also done in response to a complaint that he had slate in both of them. The X-ray report indicated no radiopaque foreign bodies were identified.

Hunt next saw Hartigan on January 31, 2008. He reported his back pain was unremitting, but his GERD and chest pain were improved or resolved. Hartigan added Wellbutrin to Hunt's medicines because his depression did not seem to be improving. He also ordered a neurosurgery consult.

Hunt underwent a polysomnogram (sleep study) on March 3, 2008, that was indicated by his sleep apnea. The results showed that he has mild to moderate obstructive sleep apnea that appears to be related to thumb sucking behavior. He is a mouth breather. The report concludes that an underlying, more severe sleep apnea syndrome is possible but further interpretation was limited due to Hunt's lack of supine sleep.

Hunt was seen in Dr. Usiakimi Igbaseimokumo's neurosurgery clinic on April 3, 2008, for his back pain. Dr. Igbaseimokumo diagnosed low back pain and bilateral hand pain. He reported that Hunt was a "healthy male who is slightly overweight with a pendulous abdomen." He reported that Hunt's cranial nerves are intact and power in his extremities was normal. Hunt's MRI scans showed degenerative disks at L3-4, L4-5 and L5, S1, but there was no obvious focal compression of the nerve roots or thecal sac. X-rays of Hunts lumbar spine showed L5-S1 spondylolisthesis with mild subluxation. Dr. Igbaseimokumo reported that he would treat Hunt conservatively but would obtain a "computed tomography scan" of Hunt's lumbar spine for review. He encouraged Hunt to continue taking his pain medications.

At Hunt's June 13, 2008 appointment with Hartigan, he reported continuing low back pain with minimal radiation – the Neurontin seemed to help with this. His depression appeared improved a little. At this time, Hunt's sleep study results were back and Hartigan referred Hunt to ENT to try to resolve the thumb-sucking issue.

On June 19, 2008, a CT on Hunt's lumbar spine was taken and reviewed by Dr. Kraig J. Lage. Dr. Lage reported L5 bilateral spondolysis with a grade 1 spondylolisthesis and a mild bilateral foraminal stenosis as well as mild degenerative joint disease. No acute fracture or subluxation was found.

At Hunt's September 2, 2008 appointment with Hartigan, Hunt indicated he was doing relatively well. He had been losing weight but still had fatigue and low back pain and was considering epidural steroid injections. He indicated he had seen an ENT doctor and would be getting sinus surgery.

In October 2008 Hunt consulted Dr. Kirk M. Wanless regarding sinonasal difficulties. That same month, Hunt underwent surgery on his nose and sinuses to alleviate upper airway obstructions. Wanless's report from May 4, 2009 indicates Hunt generally felt improved after the surgery, with better ability to breathe through his nose and fewer headaches. On May 4, 2009, Wanless performed an adenotonsillectomy and direct microlaryngoscopy on Hunt. The histopathology report on Hunt's tonsils indicated he had follicular lymphoid hyperplasia.

At Hunt's November 12, 2008 appointment with Hartigan, he was seen for low back pain, GERD, thumb-sucking, obstructive sleep apnea, depression, hyperlipidemia, and weight issues. There were no remarkable changes.

At Hunt's December 1, 2008 appointment with Hartigan he was seen for low back pain, depression and hyperlipidemia. Hartigan indicated he was going to restart Hunt on his Wellbutrin, and Hunt would try to take Ultram more faithfully. His low back pain was noted to be "stable."

On January 14, 2009, Hunt saw Hartigan again for his back pain and depression. Hartigan's report indicates Hunt's back pain had radiated to the back,

right calf, right foot and right thigh. It was aggravated by ascending stairs, bending, sitting, standing and walking. It was relieved by lying down and taking pain medication. Hartigan reported Hunt had the symptoms of a major depressive episode. Hunt was experiencing anxious, fearful thoughts, irritable mood, diminished interest or pleasure, fatigue or loss of energy, poor concentration, indecisiveness, sleep disturbance and thoughts of death or suicide. Hunt reported it was difficult for him to meet home, work or social obligations. Hartigan listed Hunt's chronic problems as hyperlipidemia, depressive disorder, overweight, obstructive sleep apnea, and back pain – low.

Chris Hartigan completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) for Hunt on January 14, 2009. He indicated his diagnosis was severe depression with chronic back pain. He rated Hunt's ability to follow work rules, relate to co-workers, use judgment, function independently and maintain attention/concentration as "fair." He rated Hunt's ability to deal with the public, deal with work stresses and function independently as "poor or none." In conjunction with these limitations, Hartigan noted that Hunt's low back pain with right leg radiation causes severe activity limitations. Hartigan rated Hunt's ability to understand, remember and carry out detailed, but not complex, job instructions and his ability to understand, remember and carry out simple job instructions as "fair." Hartigan rated Hunt's ability to understand, remember and carry out

complex job instructions as "poor or none." Hartigan rated Hunt's ability to maintain his personal appearance as "fair." He rated Hunt's ability to behave in an emotionally stable manner and relate predictably in social situations as ranging between "fair" and "poor or none," noting that Hunt has difficulty making appointments on time. He reported that Hunt's ability to sit, stand, bend and lift is affected by his impairment. Finally, Hartigan indicated that Hunt is able to manage benefits in in his own best interest.

Hunt was seen by Dr. Terry L. Thrasher on November 9, 2009 for a new patient appointment. Though most of Thrasher's notes are illegible, it is clear Thrasher's diagnosis was "back pain" and hyperlipidemia, and Hunt was prescribed medications, including Lipitor, for treatment.

A Psychiatric Review Technique for Hunt was completed by Stanley Hutson, PhD. on March 22, 2010. Hutson's report indicates that Hunt has depression, that his impairment is not severe, and that although it is a medically determinable impairment, it does not precisely satisfy the diagnostic criteria listed on the form. Hutson reported that Hunt's depression causes a mild restriction on his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence or pace. Hutson reported that Hunt has not experienced repeated episodes of decompensation. In his written notes, Hutson indicated that since the prior ALJ denial of Hunt's application, Hunt had

been seen by a physician on one occasion in November 2009. That doctor reported that Hunt was alert and oriented and did not note any abnormalities with Hunt's mental status. Hutson reported that Hunt has not had any hospitalizations or counseling services for mental health issues. Hutson noted that Hunt's function report indicated limitations in all areas of functioning but was not substantiated by his history of medical treatment or his complaints to physicians. Hutson questioned the credibility of Hunt's statements in the function report, in light of the evidence in the file. Lastly, he found that the evidence did not support a severe mental health impairment.

Hunt was referred to R.M. Newton, Ph.D., by his Missouri Division of Family Support case worker for a psychological consultation on August 17, 2010. Newton reported that Hunt complained at some length of back pain, describing it as "like a dagger" and saying that if he throws it out, he is "four days on a heating pad." Hunt told Newton about the accident that caused his back injury and ongoing pain—he claimed it occurred while he was helping to build a mall. Hunt claimed his pain is at least a five, but at worst a "double ten" (if ten were the most intense pain that one could imagine). He estimated his pain at the time of his consultation with Newton as a six or seven. Newton reported Hunt "moves freely and ambulates with no difficulty."

Hunt described his mood as "pissed off" and said he is hurt and upset and takes his anger out on people. Hunt indicated he hates lawyers and judges. He claimed he sleeps for four hours at a time since "the accident." Hunt told Newton he thinks of suicide all the time but has no intent or plan. Newton's report describes Hunt as appearing "quite angry and vituperative" as well as "quite verbal."

Newton reported that Hunt lives with his girlfriend in a house owned by her and that he has no income. Hunt indicated he does household chores such as vacuuming, dishwashing, steam mopping, and making the bed. Hunt stated he manages his own self-care and continues to drive despite a suspended license. He stated it takes him two hours to wake up and he doesn't want to be talked to. If he "has the kids" he is on edge. He "can't stand babies or women."

Newton's report indicates Hunt was alert and well-oriented. He could successfully perform serial three series in reverse, count backwards, repeat the alphabet and perform simple calculations quickly. He could also make accurate change for small amounts.

Though originally born in Decatur, Illinois, when he was young, Hunt was "adopted out" to an uncle in Chicago. He was bullied and beaten up early in school, believes he has dyslexia and hates math.

Newton reported that Hunt stated he is a jack of all trades but master of none. He stated he does not see his pay checks because he owes $32,000 in child support. He stated "there aren't any jobs" and claimed he had been out of work too long to do construction. He claimed he tried to go back to construction two years after he had his accident but then sprained his ankle. He said he is not currently looking for work: "I gave up. I can't fill out an application due to my carpal tunnel."

Newton's final diagnostic impressions were as follows:

- Axis I[2]: 307.89 Pain Disorder associated with both psychological factors and general medical condition, chronic (provisional)

- Axis II: 301.7 Anti-social personality disorder

- Axis III: Deferred

- Axis IV: Economic and relational stressors, phase of life problems

- Axis V: GAF: 55[3]

---

[2] The axial system of evaluation allows clinicians to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning (GAF). *Mayes v. Astrue*, 1:11-CV-02233, 2012 WL 5925439, at *3 n.3 (W.D. La. Sept. 28, 2012) report and recommendation adopted, CIV.A. 11-02233, 2012 WL 5924837 (W.D. La. Nov. 26, 2012) citing Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25–35 (4th ed. 2000). The axial system of evaluation is set out in the Fourth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV). *Tietz v. Shinseki*, No. 12-0384, 2013 WL 3830514, at *2n.3 (Vet. App. July 25, 2013). Although use of the axial system and GAF scores, discussed below, has been abandoned in the Fifth Edition of DSM (DSM-V), DSM-IV was still the operative edition at the time of Dr. Newton's consultation. *See Dehart v. Colvin*, No. 4:12cv137-WGH-TWP, 2013 WL 6440504, at *6 (S.D. Ind. Dec. 9, 2013).

Notably, Newton wrote that his Axis I diagnosis was offered without any evidence of physical difficulties or medical information and with the disclaimer that, in any case, these are conditions he is not qualified to judge. Newton also noted that Hunt "appears to be prevented from working primarily by complaints, i.e. regarding unavailability of work, etc."

In September 2010, the Missouri Department of Social Services determined Hunt was eligible for Medicaid, listing his primary diagnoses as pain disorder associated with both psychological factors and general medical condition (chronic), antisocial personality disorder, GAF=55, obesity, and chronic low back pain.

Hunt was seen by Dr. Terry Thrasher again on November 1, 2010. Thrasher noted that at the time of his appointment, Hunt was not taking any medication. Thrasher diagnosed Hunt with an upper respiratory infection and depression. His notes are otherwise mostly illegible.

On March 16, 2011, Robert Eichenberger, a licensed professional counselor, sent Hunt's attorney a letter summarizing two psychotherapy sessions Hunt had

---

[3] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational, and psychological functioning "on a hypothetical continuum of mental health-illness." Diagnostic & Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994). A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ." *Id.* Notably, the "Commissioner of Social Security has declined to endorse the GAF scale for use in the Social Security and SSI disability programs and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Czarnionka v. U.S. Soc. Sec. Admin., Comm'r*, 12-CV-417-JL, 2013 WL 4048507, at *2 n.3 (D.N.H. Aug. 8, 2013).

with Eichenberger on 3/25/2010 and 4/1/2010.  Eichenberger noted that Hunt presented with multiple concerns including chronic poor sleep, irritability, constant physical pain, arthritis, carpel tunnel syndrome, crippling financial debt, daily headaches, poor family and friend support and inability to find and maintain a job.  Hunt also claimed he was dyslexic and had ADHD.  He had suicidal ideation without means or plan.  Eichenberger wrote that due to the brevity of treatment he was "unable to make inroads in developing a plan of treatment" with Hunt.  Eichenberger's diagnoses of Hunt were 300.02, Generalized Anxiety Disorder, and 296.32, Major Depression, recurrent, moderate severity.

On March 29, 2011, Hunt was seen by Dr. Ian Fawks for an "establishment of care" appointment.  Fawks reported that Hunt had last been seen by Dr. Thrasher, who closed his business.  At the time of the appointment, Hunt had not seen a doctor for 5-6 months due to lack of insurance, and he had not been on medications during that time.  Hunt's main complaints were low back pain, right hip pain, and right knee pain.  He indicated his pain was daily and affected his activity.  Hunt had no other complaints.  Fawks noted that Hunt could move from a chair, get onto the exam table, lie back on the table, get back to a seated position, and stand up off the table "without too much observed difficulty."  However, he wrote that a Hunt needed a full medical workup.  Finally, Fawks noted that Hunt's report indicated he was seeking SSI benefits.  It was Fawks's opinion at that time

that although Hunt "obviously [had] medical issues … he actually would be a good candidate for vocational rehab and assistance…." However, "final opinion will be held pending the review of the blood work and further evaluation of the patient."

On April 12, 2011, Hunt was seen by Dr. Ian Fawks to follow up on his chronic conditions of degenerative disk disease and arthritis in his knees. Hunt complained his pain in both areas had been increasing. His only other complaints were cough and congestion. Fawks noted that Hunt was not taking any medications at the time of his visit. Hunt complained of chronic low back pain with some radiation into his buttocks but no pain into his lower legs. Fawks noted that Hunt "does move with an antalgic gait and has difficulty getting up onto the exam table." Fawks prescribed Hunt medications for pain and noted that he would like to have Hunt seen by a specialist to have further workup on his back and knees and to manage his pain.

On May 11, 2011, Fawks sent a letter to Hunt's attorney, Karen Kraus Bill, in response to her letter requesting a completed medical assessment form for Hunt and an explanation of the basis for Hunt's inability to work on a full-time basis. Fawks's letter reported that although Hunt has arthritis and disk disease in his lumbar spine, an x-ray of his knees showed no significant arthritis. Fawks wrote that although Hunt has some chronic conditions, it would be "difficult" for Fawks to say that Hunt cannot work on a full-time basis. Fawks acknowledged that

Hunt's joint pain and antisocial personality disorder along with poor memory and bipolar disorder were issues in filling out his medical assessment. Fawks wrote that a better avenue for Hunt would be to undergo vocational rehabilitation and find a job where he could sit down more often than not and work independently without distractions or interactions with people that would adversely affect his emotional state. Fawks reminded Ms. Bill that he is a family medicine doctor and does not have a specialty in occupational medicine.

Per Ms. Bill's request, Dr. Fawks completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) for Hunt on May 11, 2011. In the section addressing Hunt's ability to make occupational adjustments, Fawks reported that Hunt's ability to follow work rules is unlimited/very good. He reported that Hunt's ability to use judgment is good. He reported that Hunt's ability to relate to co-workers, deal with the public and function independently is fair. He reported that Hunt's ability to interact with supervisors, deal with work stresses and maintain attention/concentration was poor or none. Fawks listed Hunt's limitations that support this assessment as personality disorder (antisocial) and manic/depression (bipolar). In the section addressing Hunt's ability performance adjustments, Fawks indicated Hunt's ability to understand, remember and carry out simple job instructions was fair. He indicated Hunt's ability to understand, remember and carry out complex, or detailed but not complex, job

instructions was poor or none.  Fawks reported that the findings supporting this assessment were Hunt's own report of his poor memory.

In the category of making personal-social adjustments, Fawks reported that Hunt's ability to maintain personal appearance and demonstrate reliability was good.  Hunt's ability to behave in an emotionally stable manner or relate predictably in social situations was poor or none.  Fawks noted that Hunt's anti-social personality disorder limits his abilities in this category.

Finally Fawks noted that Hunt has chronic joint pain in his knees, back and hip that affects both his physical and emotional status.

### *Hunt's Testimony before ALJ*

At the administrative hearing before the ALJ on April 20, 2011, Hunt testified that he lives in Moberly with his daughter, stepson and "on and off" girlfriend.  He has a tenth grade education and has tried to get his GED certificate nine different times but has stopped pursuing it because he is unable to afford the gas required to "go to the school and back."

Hunt affirmed that he is claiming to have been disabled since 1994 but testified that from 1994 to "somewhere around" 2000 he worked as much as he could.  He stopped working when he began having progressively worse back pain and was diagnosed with four degenerative discs in his back.  His last job was in

2003 as a bouncer. He currently gets his medication from his "new doctor," Ian Fawks.

Hunt testified that he has had no suicide attempts since 1991, though there are times when he wants to "eat pills or shoot a gun to [his] head."

Hunt's attorney, after some discussion with the ALJ, agreed that Chris Hartigan was not a doctor but an "advance registered nurse practitioner" who works under a doctor's authority and has prescription authority under the doctor's license.

Hunt indicated that, at the time of the hearing, he was being treated for his lower back pain by Dr. Fawks, who had prescribed Vicodin as well as "some other pills" for Hunt's bronchitis. Hunt testified that Fawks told him at their last visit that they would work on "one thing at a time" for purposes of Hunt's care because Fawks had only recently received Hunt's files and had not yet fully comprehended all of Hunt's health issues.

Hunt stated his lower back pain "feels like a knife being jabbed in [his] spine and somebody turning it, and spreading the discs apart…." He stated he feels this pain all the time and because of it, he is unable to run. Sitting, standing or laying down for too long also causes him pain, so he has to "adjust all the time." He testified that he can stand for five to ten minutes at a time and sit for five to twenty minutes at a time. Because of the perpetual positional adjustment he has to do,

Hunt stated he is "lucky" if he gets two to four hours of sleep per night. He has tried taking "Ambien and stuff like that" to help him sleep, but the medications did not help. Because of his back condition, Hunt was told by Chris Hartigan to limit the amount he lifts to no more than three pounds.

Hunt stated that the other health problems he and Fawks are planning to address are arthritis in his back, hip and knees; carpal tunnel in both hands; and depression. Hunt stated if he tries to walk very far his hip feels "like it's going to come out," and his knees "are just, you know, pain here, pain there." The carpal tunnel makes it difficult for him to hold things, such as a hammer, glass, or pen, for any length of time. He estimated he can write three or four sentences before needing to stop. Hunt testified that Dr. Fawks is planning to send him for evaluation of the carpal tunnel.

Hunt stated that his depression causes suicidal thoughts and makes him not want to be around people. He testified that he "[c]an't stand being around law enforcement" and he would "rather be at home and away from everybody, left alone." He stated he has crying spells at least every other day and has no activities away from home. Hunt testified that stress exacerbates his depression. In particular, he is stressed about his kids—about not being able to help pay for things or get a job.

*Medical Expert's Testimony*

Medical expert, Dr. Harry Haas, testified that Hunt's records indicate that he has chronic low back problems occurring over 14 years, as well as, more recently, pain radiating down his right lower extremity. In April 2008 a neurosurgeon found that Hunt has degenerative disc disease and recommended conservative treatment. Hunt also had an MRI and a CT scan of the lumbar spine that confirmed the degenerative joint disease and degenerative disc disease. Haas testified that "matters of a psychological nature" found in B11F, B10F and B9F "supported the finding of major depressive disorder recurrent, suicide attempt, generalized anxiety disorder, and anti-social personality." He testified that a combination of low back pain and major depression seem to be Hunt's main issues involved in his ability to perform work. Haas stated that considering those issues, Hunt would have a "light RFC, 20 pounds occasionally, 10 pounds frequently, stand and/or walk at least [two hours], sit six hours, and some positional limitations of kneeling, crouching and crawling only occasional." Because of Hunt's obesity and back pain, Haas testified that balancing should only be on occasion and he should do no climbing of ramps or stairs, ladders, ropes or scaffolds. In support of his findings regarding Hunt's psychiatric problem, the Haas cited to the reports of Reverend Eichenberger (B11F), Dr. Thrasher, and Dr. Newton.

When pressed by Hunt's attorney, Haas confirmed that his RFC was "strictly physical" and that he was not "making any assumptions as for [Hunt's] mental limitations." He acknowledged that in determining the RFC he was aware of Chris Hartigan's Medical Assessment of Ability to do Work Related Activities (Mental).

*Vocational Expert's Testimony*

Vocational expert Julie Harvey also testified before the ALJ. Harvey first classified prior jobs held by Hunt as follows: (1) warehouse worker—medium, unskilled; (2) landscape laborer— heavy, unskilled; (3) rebar cutter—light, unskilled work; (4) restaurant cook—medium, skilled; (5) dishwasher—medium, unskilled; (6) bouncer—light, semi-skilled; (7) concrete laborer—very heavy, unskilled; (8) delivery driver—light, unskilled. She then responded to one hypothetical posed by the ALJ. The hypothetical was based on the functional limitations determined by medical expert Dr. Haas, which the ALJ noted were more restrictive than the functional limitations determined by the state agency. Harvey testified that a person with the functional limitations as characterized by Dr. Haas would not be able to do any of Hunt's past work. Harvey testified that the functional limitations determined by Dr. Haas would make Hunt only qualified for jobs in the sedentary range.

The ALJ asked if any of Hunt's skills from his skilled job as restaurant cook or semi-skilled job as bouncer would be transferable to a skilled, sedentary job.

Harvey stated that they would not.  Next, the ALJ asked whether there were any unskilled jobs with the functional limitations determined by Dr. Haas.  Harvey testified that the following unskilled, sedentary jobs would fit the functional limitations prescribed by Dr. Haas: film touch up inspector; printed circuit board assembly touch up screener; and microfilm document preparer.

Then the ALJ then turned to the Medical Assessment to do Work-Related Activities (Mental) completed by Chris Hartigan.  He posed a hypothetical to Harvey based on the non-exertional/mental health limitations contained in Hartigan's assessment, asking "with those non-exertional limitations in the mix, could a person do the jobs you've given me?"  Harvey testified that a person could not and, further, that there were no other jobs in the national economy that such a person could perform.

## III.  Standard for Determining Disability under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work. If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, he is declared disabled. 20 C.F.R. § 404.1520; § 416.920.

*Evaluation of Mental Impairments*

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 920a. As relevant here, the procedure requires an ALJ to determine the degree of functional limitation resulting from a mental impairment. The ALJ considers limitation of function in four capacities deemed essential to work. 20 C.F.R. § 416.920a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 416.920a(c)(3). After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme. The degree of limitation with regard to episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more. *See* 20 C.F.R. § 416.920a(c)(4).

## IV.    The ALJ's Decision

Applying the five-step sequential evaluation, the ALJ first determined that Hunt had not engaged in substantial gainful activity since the date he applied for SSI benefits, November 16, 2009.

At step two, the ALJ found that Hunt had severe impairments of degenerative disc disease of the lumbar spine, arthritis, bilateral carpal tunnel syndrome, sleep apnea and obesity.  The ALJ determined that Hunt's mental impairments of chronic pain disorder/depression and anti-social personality disorder do not cause more than minimal limitation in his ability to perform basic work activities and are therefore non-severe.  In making this finding the ALJ considered the four functional areas used for evaluating mental impairments.  In the area of daily living, the ALJ found Hunt has mild limitation as he is able to take his daughter to and from school, do household chores, perform his own personal care, prepare his own lunch, and drive and go out alone.  He determined that Hunt has a mild limitation in the area of social functioning, noting that Hunt lives with his girlfriend and visits his family regularly.  In his function report, Hunt claimed he gets so irritated he hurts people, but the ALJ noted this claim was unsupported and Hunt has had no legal problems resulting from harming another person.  In the area of concentration, persistence or pace the ALJ found Hunt to have mild limitation.  He noted that Hunt can follow written but not spoken

instructions, and at the mental status examination he could perform Dr. Newton's various mental/concentration exercises with no problem. Finally, the ALJ noted, under the fourth functional area, that Hunt has experienced no episodes of decompensation that have been of extended duration.

At step three, the ALJ determined that Hunt does not have an impairment or combination of impairments that meets a listing. The ALJ considered Hunt's back impairment but determined it does not meet a listing because Hunt is still able to ambulate and perform fine and gross movements effectively. Additionally, Hunt has no nerve root compression, limitation of motion of the spine, or motor loss accompanied by sensory or reflex loss.

The ALJ also considered Hunt's bilateral carpal tunnel but determined it does not meeting a listing because it has not caused significant and persistent disorganization of motor function in two extremities that results in sustained disturbance of gross and dexterous movements.

Lastly at step three, the ALJ considered Hunt's sleep apnea but found it does not meet a listing because it does not result in mean pulmonary artery pressure greater than 40 mm Hg. or arterial hypoxemia, as required by the listing.

Next, the ALJ found that Hunt has the residual functional capacity to perform sedentary work, except that he can lift and carry 20 pounds occasionally and lift and carry 10 pounds frequently; stand and/or walk for 2 hours in an 8-hour

day; sit for 6 hours in an 8-hour day; never climb ropes, ladders or scaffolds; and occasionally climb stairs and ramps, kneel, crouch, and crawl.

In fashioning Hunt's RFC, the ALJ determined that his impairments could be expected to produce some of his alleged symptoms; however, he concluded that Hunt's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible to the extent they were inconsistent with his RFC. In his review of the evidence, the ALJ gave Hartigan's Medical Assessment of Ability To Do Work-Related Activities (Mental) little weight because Hartigan was not a licensed physician or licensed or certified psychologist for purposes of evaluating Hunt's mental limitations. The ALJ also gave little weight to the opinions of Dr. Fawks regarding Hunt's mental restriction where they were not supported by the medical findings in the record. The ALJ noted Hunt had seen Fawks only twice, he had not been taking his medication prior to his visit to Dr. Fawks, and he has had no significant treatment by other mental health professionals. Hunt has never been hospitalized for a psychiatric condition and Fawks's report appeared to contain inconsistences. Fawks indicated no complaint, diagnosis or referral to care for mental health conditions and reported no history of psychiatric disorders. The ALJ determined that Fawks's opinion seems to rely on an assessment of an impairment for which Hunt received no treatment from Fawks. The ALJ gave great weight to the state agency psychologist, Dr. Newton's,

assessment because it was supported by medically acceptable clinical and laboratory findings and is consistent with the record in its entirety. Furthermore, the medical expert's opinion correlated with Dr. Newton's opinion.

At step four, in light of Hunt's RFC, the ALJ relied on the testimony of the vocational expert in determining that Hunt is unable to perform past relevant work.

At step five, the ALJ again relied on the vocational expert's testimony in determining that Hunt is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and concluded that Hunt was not disabled.

## V.    <u>Standard of Review</u>

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2003). "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion. *Id.* When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.    Discussion

Hunt alleges that the ALJ erred by (1) failing to give proper weight to the opinions of Hunt's treating physician, Ian Fawks, D.O. and treating nurse practitioner, Chris Hartigan; and (2) failing to provide a sufficient medical basis for his residual functional capacity (RFC) finding.  Hunt asserts that because the ALJ rejected the opinions of Dr. Fawks and Chris Hartigan, he "could not have ascertained [Hunt's] ability to work without engaging in medical conjecture."

*Medical Opinion of Chris Hartigan*

Hunt claims that the ALJ failed to accord Chris Hartigan's medical source opinion proper weight and that, if given proper weight, Hartigan's opinion would have required that the ALJ find Hunt disabled.

The records signed by Hartigan indicate that in 2007 he was an advanced practice registered nurse (APRN), and beginning sometime in 2008, he was a board certified family nurse practitioner (FNP). As an APRN and/or FNP, Hartigan is not considered an "acceptable medical source" under the Code of Federal Regulations, but rather, is considered an "other medical source." 20 C.F.R. § 416.913. As an "other medical source," Hartigan's opinions cannot establish the existence of a medically determinable impairment but can be considered in determining the severity and effect of Hunt's impairments. 20 C.F.R. § 416.913(d).

The Social Security Administration has specifically addressed the value of opinions from other medical sources. *See* Social Security Ruling (SSR) 06-03p, 71 FR 45593-03 (Aug. 9, 2006). In its August 9, 2006 ruling the SSA explained that "with the growth of managed health care in recent years and the emphasis on containing medical costs," nurse practitioners, social workers and others "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." As such,

opinions from other medical sources, like nurse practitioners, "are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." *Id*. (quoted in *Sloan v. Astrue*, 499 F.3d 883, 888-89 (8th Cir.2007).

In general, when weighing the opinion of an "other medical source," an ALJ should consider the length of time and frequency of the claimant's visits with the source; the consistency of the source's opinion with other evidence; the evidence and explanations supporting the source's opinion; the source's specialty; and "[a]ny other factors that tend to support or refute the opinion." SSR 06-03P; *Sloan*, 499 F.3d at 889. The 2006 ruling directs that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence … allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p.

Here, after summarizing the opinion evidence from Hartigan, the ALJ determined that Hartigan's opinion should be given little weight simply because "[a]n advanced practice registered nurse is not an acceptable medical source to provide a medical opinion of the claimant's impairment. He is not a licensed physician (medical or osteopathic doctor). He certainly is not a licensed or certified psychologist for purposes of evaluating the claimant's mental

limitations." The ALJ did not further discuss his evaluation of Hartigan's opinions or give any other explanation for according Hartigan's opinions little weight.

I find that the ALJ failed to properly apply the law when he accorded Hartigan's opinion little weight based solely on the ground that Hartigan is not a medical doctor or acceptable medical source. As noted above, the SSA has clearly ruled that in today's healthcare environment, opinions from other medical sources should not be discounted based exclusively on their source. *See Sloan*, 499 F.3d at 889–90 (remanding case where ALJ "summarily dismissed" records and recommendations from claimant's social workers "simply because they were too low on the pecking order as he understood it to exist"); *see also Van Vickle v. Astrue*, 539 F.3d 825, 829 (8th Cir. 2008) (citing SSR 06-3p and noting that an ALJ may determine that an occupational therapist's opinion outweighs the opinion of a treating physician) and *Williams v. Colvin*, No. 12-5132-SSA-CV-SW-MJW, 2013 WL 6229147, at *2 (W.D. Mo. 2013) (case remanded for ALJ to give specific consideration to the opinion of a nurse practitioner in accordance with the factors set forth in SSR 06-03p). The record shows that Hunt was seen by Hartigan with more consistency and frequency than he was seen by any other health care provider, which makes a curt dismissal of his opinions all the more misplaced. It is also significant here that the weight accorded Hartigan's opinion has a clear effect on the outcome of Hunt's case. When the ALJ posed a

hypothetical to the vocational expert that took into account the limitations caused by the mental health issues diagnosed in Hartigan's assessment, the vocational expert testified that there would be no jobs in the national economy that Hartigan would be able to perform.

Because the ALJ applied the wrong standard in determining how much weight to accord the opinion of an "other medical source," I will remand for the ALJ to weigh Hartigan's opinions using the factors set out in SSR 06-3p.

### *Medical Opinion of Ian Fawks, D.O.*

Hunt appears to argue that as a treating physician, Dr. Fawks's opinion should have been accorded controlling weight. The regulations require that a treating source's opinion be given controlling weight if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2). However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). An ALJ may discount or disregard the opinion of a treating physician where other medical assessments are supported by better medical evidence, or where the treating physician renders inconsistent opinions that undermine his credibility. *Id*. at 897-98.

Here, the ALJ noted that he gave little weight to the opinion of Dr. Fawks specifically regarding Hunt's mental restrictions and limitations, where the opinions were "not supported by the signs, symptoms and medical findings in the record." The ALJ went on to articulate reasons for discounting Dr. Fawks's opinion, including Hunt's brief treatment history with Dr. Fawks, Dr. Fawks's lack of specialization in psychiatry or psychology, inconsistencies in Dr. Fawks's reports and opinions, and an absence of other medical evidence in the record showing any significant treatment for mental health problems. Upon a review of the record I find substantial evidence exists to support the ALJ's above-enumerated findings. Therefore, the ALJ was not required to give controlling weight to Dr. Fawks's opinions. *See Perkins*, 648 F.3d at 897-99.

### Medical Basis for the ALJ's Residual Functional Capacity Determination

Lastly, Hunt argues that because the ALJ discounted the opinions of Hunt's treating sources, Hartigan and Fawks, it was not possible for him to ascertain Hunt's residual functional capacity "without engaging in medical conjecture."

To the extent Hunt contends Hartigan, a nurse practitioner, should be considered a "treating source" pursuant to 20 C.F.R. § 416.927, he is wrong. Therefore, I will assess and discuss this argument with regard to Fawks's opinion only.

As I have already noted, the ALJ chose to give Dr. Fawks's opinion "little weight" to the extent it addressed Hunt's mental restrictions and limitations. The ALJ instead credited the evidence and opinion of consulting psychologist Dr. Newton by according Dr. Newton's opinion "great weight."[4] While Dr. Fawks's Medical Assessment of Ability to Do Work-Related Activities (Mental) appears to conclude that Hunt has moderate to severely limiting mental health impairments, Dr. Newton concluded that although Hunt has anti-social personality disorder, he appears "to be prevented from working primarily by complaints, i.e. regarding unavailability of work, etc."

"When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir.2000). "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Id*. (internal quotations and citations omitted). However, the 8th Circuit has recognized two exceptions to this general rule; it has upheld an ALJ's decision to discount or disregard the opinion of a treating source

---

[4] At page 18 of the administrative transcript, the ALJ wrote in his opinion "[t]he state agency psychologist's assessment is given great weight because it is well-supported by medically acceptable clinical and laboratory findings and is consistent with the record when viewed in its entirety (Exhibit B2F)." The state agency psychologist was Dr. Newton, but the exhibit referenced by the ALJ is the psychiatric review technique form. As such, it appears that the exhibit reference was merely a typo. Dr. Newton's report can be found at Exhibit B9F, pages 301-304 of the administrative transcript.

and give greater weight to the opinion of a consulting source where: (1) other medical assessments are supported by better or more thorough medical evidence, or (2) a treating physician renders inconsistent opinions that undermine the credibility of such opinions.  *Id.*

In *Cantrell*, the 8th Circuit applied the first exception in holding that the ALJ's decision was supported by substantial evidence.  231 F.3d 1104.  The ALJ credited the opinion of two consulting doctors, who had each examined the claimant once, and discredited the opinion of the claimant's treating doctor.  *Id*. at 1107.  The Court found that the consulting doctors had spent significant time evaluating the claimant, run thorough "testing regimens" on him, and completed thorough reports.  In contrast, the treating doctor's opinion consisted of "two pages of checked boxes devoid of illuminating examples, descriptions, or conclusions." *Id*. at 1107.  In light of the thoroughness of the consulting doctors' reports, the Court held that the ALJ had properly exercised his discretion to favor their opinions.  *Id.  See also Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (the ALJ was was entitled to discount treating doctor's opinion of claimant's inability to work because it was inconsistent with previous opinions).

Because both of the foregoing exceptions recognized by the 8th Circuit apply here, I find that substantial evidence exists on the record to support the ALJ's residual functional capacity determination.  As to the first exception, Dr. Newton's

evaluation of Hunt was far more thorough than Dr. Fawks's assessment. Dr. Newton's conclusion was supported by several pages of written analysis of Hunt's behavior, background, and mental proficiencies, which the doctor prepared after meeting with Hunt specifically for a psychological consultation. In contrast, Dr. Fawks saw Hunt in the capacity of a general practitioner, with no special or in-depth focus on Hunt's mental health. The assessment of Hunt's mental abilities completed by Dr. Fawks primarily contains a series of check marks under pre-set categories with very little narrative support or detail regarding Hunt's limitations.

With regard to the second exception, as noted above and by the ALJ, Dr. Fawks's opinions appear to contradict one another. Although he ascribed moderate to severe mental health limitations to Hunt in his May 5, 2011 assessment, in his clinic notes from March 29, 2011 and April 12, 2011, he made no mention of any complaint, diagnosis, or referral to care for any mental health conditions. Additionally, in his letter to Hunt's attorney dated May 11, 2011, Dr. Fawks acknowledged the presence of Hunt's anti-social personality disorder but wrote that this "could be a good opportunity for [Hunt] to undergo vocational rehab. He may do well with a job… where he could work independently and not have distractions or interactions with folks that would adversely affect his emotional state."

It is also of note that although Fawks is technically considered Hunt's treating physician, at the time Fawks submitted his opinion, he had met with Hunt no more than three times.  Therefore, the advantage that a treating physician is supposed to offer—the ability to provide a "detailed, longitudinal picture" of a claimant's medical impairments—is not present here.  *See* 20 C.F.R. § 416.927(c)(2).  Furthermore, both the testimony of the medical expert and the absence in Hunt's medical record of any significant treatment history for mental health issues support Dr. Newton's conclusion that Hunt's mental impairments have little to no effect on his ability to work.

In his brief, Hunt cites *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), to argue that, absent information from treating sources, it is not possible to ascertain a claimant's ability to work without engaging in medical conjecture.  In *Nevland*, the 8th Circuit noted that there was no medical evidence in the record regarding how the claimant's impairments affected his ability to function.  *Id*.  Instead, the ALJ relied on the opinions of non-treating, non-examining physicians to determine the claimant's RFC.  *Id*.  The Court held that this did not satisfy the ALJ's duty to fully and fairly develop the record.  *Id*.

*Nevland* is not relevant to this case because here the ALJ had in the record, and relied upon, an opinion from an *examining* physician in order to fashion Hunt's RFC.  Dr. Newton's opinion is supported by a thorough report that was

written after conducting a careful evaluation. As such, the ALJ acted within his discretion in relying on Newton's opinion.

Hunt next points to two 8th Circuit cases that he claims hold an ALJ may not draw his own inferences from medical reports or substitute his own medical judgment for that of an examining physician. Regardless of the merit of each of these cases, or whether Hunt has properly represented their holdings, his argument is misguided. Here, the ALJ did not substitute his own medical opinion for that of treating physician Fawks, rather, he substituted the medical opinion of another examining physician, and it was within his discretion to do so.

## VII.  Conclusion

In sum, because the ALJ used the wrong standard in determining the proper weight to accord the opinion of Chris Hartigan, I will remand in order for the ALJ to weigh Hartigan's opinions using the factors required for other medical sources.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 18th day of August, 2014.